# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

THE HILSINGER COMPANY, )
)
Plaintiff, )
) **Civil No.**
v. ) **14-14714-FDS**
)
FBW INVESTMENTS, LLC, and )
KLEEN CONCEPTS, LLC, )
)
Defendants. )
)
_____)

## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTIONS TO DISMISS

**SAYLOR, J.**

This is an action for trademark infringement. Plaintiff Hilsinger Company has brought

suit against defendants FBW Investments, LLC and Kleen Concepts, LLC. The complaint

alleges that defendants' use of the mark "SHIELDME," in connection with cleaning products has

infringed Hilsinger's "SHIELD" brand by creating a likelihood of confusion as to whether

"SHIELDME" products "originate with, or are sponsored, affiliated, or approved by, Hilsinger."

The complaint asserts claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and for

violation of common-law trademark rights.

On February 6, 2015, FBW filed a motion to dismiss the complaint for lack of personal

jurisdiction under Fed. R. Civ. P. 12(b)(2) and improper venue under Fed. R. Civ. P. 12(b)(3), or,

in the alternative, to transfer the case to the Southern District of Texas under 28 U.S.C. §

1404(a). On April 14, 2015, Kleen Concepts filed a motion to dismiss for lack of personal

jurisdiction under Fed. R. Civ. P. 12(b)(2).

For the following reasons, FBW's motion to dismiss will be granted and Kleen's motion to dismiss will be denied.

## I.    Background

### A.    Factual Background

The Hilsinger Company is a Delaware corporation with a principal place of business in Plainville, Massachusetts.  (Second Am. Compl. ¶ 1).  It designs and sells eye-care, eyewear, and lens-care products.  (*Id.* ¶ 7).  In July 1985, Shield Lenscare Products, Inc. ("SLP") began marketing and selling optical lens cleaning products bearing the word mark, SHIELD.  (*Id.* ¶ 11).  On April 25, 1989, SLP obtained a federal trademark registration for SHIELD in connection with "Optical lens cleaning preparation products."  (Reg. No. 1,536,028, Second Am. Compl. Ex. A).  On June 23, 1999, SLP assigned its interest in the SHIELD Brand to The Hilsinger Company L.P., which subsequently merged with Hilsinger.  (Second Am. Compl. ¶ 13).  The brand has been used in commerce continuously since approximately July 1985.  (*Id.* ¶ 14).

FBW Investments, LLC is a limited liability company based in Houston, Texas.  (Second Am. Compl. ¶ 2).  Kleen Concepts, LLC is a limited liability company based in Scottsdale, Arizona.  (*Id.* ¶ 3).

In January 2010, Kleen Concepts began producing and selling products under the SHIELDME mark.  (Russell Decl. ¶ 5, Docket No. 46).  In July 2010, it applied for trademark registration with the USPTO for the SHIELDME mark for a "Kit containing spray to eliminate bacteria and germs on surfaces, spray to provide antimicrobial protection on surfaces, and antimicrobial c[l]oth."  (Second Am. Compl. ¶ 18).  On September 20, 2011, Kleen Concepts

obtained federal trademark registration 4,027,820 for the first SHIELDME mark. (*Id.* ¶ 19; Second Am. Compl. Ex. B). On January 21, 2013, Kleen assigned its interest in the '820 trademark to FBW. (Second Am. Compl. ¶ 20). On January 22, 2013, FBW applied for trademark registration with the USPTO for the mark SHIELDME for "Canned pressurized air for dusting and cleaning purposes; Cleaning agents and preparations; Cleaning agents for cleaning surfaces; Cleaning preparations for electronic devices and screens; Hand cleaning preparations." (*Id.* ¶ 21). On March 18, 2014, FBW obtained federal trademark registration 4,497,007 for the second SHIELDME mark. (*Id.* ¶ 24; Second Am. Compl. Ex. C).

The complaint alleges that in late 2013 or early 2014, products bearing the SHIELDME marks began appearing in Walmart stores. (Second Am. Compl. ¶ 27). Those products allegedly appeared in close proximity to SHIELD Brand products that Hilsinger had been selling to Walmart for years. (*Id.*). Products bearing the SHIELDME marks are also available for purchase online, including at Amazon.com. (Scott Decl. Ex. 4, Docket No. 12-1). The website http://www.shieldmeproducts.com contains information about SHIELDME products, although it is not possible to buy products directly on the site. (Scott Decl. Ex. 5, Docket No. 12-1). The website allows users to tweet product information, "like" products on Facebook, e-mail product information to friends, comment directly on the website, and post comments about the product on the product Facebook page. (Scott Decl. ¶ 2, Ex. 1, Docket No. 26-1). In addition, a "contact" page provides website visitors with contact information for "ShieldMe Products" and allows visitors to send a message. (Scott Decl. Ex. 1, Docket No. 26-1). SHIELDME products are available for purchase (and in-store pick-up after on-line purchase) at Walmart, Sears, and Kmart stores throughout Massachusetts. (Scott Decl. ¶ 12, Ex. 7, Docket No. 12-1; *see also* Suh

Decl., Docket No. 33-2). These products are also available for purchase at a Micro Center Computer and Electronics store in Cambridge, Massachusetts. (Stack Decl. ¶¶ 2-4, Exs. 1-2, Docket No. 47).

On July 30, 2014, Hilsinger sent FBW a cease-and-desist letter demanding that it stop using the SHIELDME marks. (Scott Decl. Ex. 2). On August 14, 2014, attorney Maria Speth responded to the cease-and-desist letter. (Scott Decl. Ex. 3). In her response, she stated the following:

> Our firm represents FBW Investments, LLC, the owner of the federally registered trademark SHIELDME in connection with "kits containing sanitizing spray to eliminate the growth of bacteria and germs on surfaces, disinfecting spray to provide antimicrobial protection on surfaces, and cloth wipes impregnated with all purpose disinfecting preparations, all used for bacteria and germ prevention" and in connection with "canned pressurized air for dusting and cleaning purposes; cleaning agents and preparations; cleaning agents for cleaning surfaces; cleaning preparations for electronic devices and screens; hand cleaning preparations." (Registration numbers 4027820 and 4497007). Our client has used the SHIELDME trademark in connection with the products described above for over four years.

(*Id.*).

In this proceeding, Speth filed an affidavit in which she stated that in responding to the cease and desist letter, she was acting "on behalf of and at the direction of Kleen Concepts." (Speth Decl. ¶ 7). She stated that "[i]n hindsight, I should have clarified in my August 14, 2014 letter that although FBW was the registrant, Kleen Concepts was the entity that manufactured and sold the SHIELDME product." (*Id.* ¶ 8).

Ronnie Weinstein, a managing member of FBW, also submitted an affidavit, in which he stated that "FBW has no business operation of any kind. It does not manufacture or sell any product, and it does not provide any service. It only holds real estate assets located in Texas." (Weinstein Decl. ¶ 2, Docket No. 9-1). He further stated that "FBW does not use the

SHIELDME trademark or make, sell or distribute any product identified by the mark SHIELDME.  To FBW's knowledge, Kleen Concepts is the only entity that has used the SHIELDME mark and sold products under that name."  (*Id.* ¶ 7).

Grant Russell, the manager of Kleen Concepts, submitted an affidavit stating that "FBW does not use the SHIELDME trademark or make, sell or distribute any product identified by the mark SHIELDME."  (Russell Decl. ¶ 11, Docket No. 9-2).  He further stated that "FBW is not involved in Kleen Concepts' operations.  FBW has no control over the sale of any SHIELDME products, including the states in which Kleen Concepts markets, distributes, or sells products.  FBW does not receive any form of compensation arising from Kleen Concept's [sic] use of the SHIELDME trademark."  (*Id.* ¶ 12).

At the time that Hilsinger filed this action against FBW, FBW was the record owner of the two SHIELDME mark trademark registrations.  (*See* Weinstein Decl. ¶ 5, Docket No. 9-1).  Although the marks were assigned to FBW, the assignment was done "with the understanding that Kleen Concepts would continue to use the trademark."  (*Id.*).  On February 12, 2015, after this action had commenced, FBW assigned both SHIELDME trademarks to Kleen Concepts.  (Speth Decl. ¶ 9).

According to Russell, Kleen Concepts "is based entirely in Arizona and has no operations, offices, assets, or employees in Massachusetts."  (Russell Decl. ¶ 4, Docket No. 46).  It "has not shipped the SHIELDME products into Massachusetts and does not ship [them] into Massachusetts."  (*Id.* ¶ 6).  Although Kleen Concepts sells to Walmart, Walmart "picks up SHIELDME products from Kleen Concepts' facility in Scottsdale, Arizona.  From Scottsdale, Walmart trucks the products to its distribution centers, none of which are in Massachusetts."  (*Id.*

¶ 7).  Kleen Concepts admits that Walmart "ships a small fraction of the SHIELDME products from its distribution center to its retail stores in Massachusetts."  (*Id.* ¶ 8).  Kleen Concepts also sells to Sears Roebuck & Co., and ships SHIELDME products to Sears at distribution centers in Pennsylvania, Illinois, Texas, and California.  (*Id.* ¶¶ 9, 10).  It does not ship those products directly to Sears or Kmart stores in Massachusetts.  (*Id.* ¶ 11).  Likewise, Kleen Concepts admits that it sells its products on Amazon.  (*Id.* ¶ 12).  It does not ship directly to customers who buy on Amazon.  (*Id.* ¶ 14).  Rather, it ships SHIELDME products to Amazon's distribution centers in Kentucky, Pennsylvania, Arizona, and Indiana.  (*Id.* ¶ 13).  In 2014, "Kleen Concepts sold a total of $11,090 worth of SHIELDME lens cleaning products to third-party retailers who brought the products into Massachusetts."  (*Id.* ¶ 18).  It sold a total of "$14,900 in all SHIELDME products . . . to third-party retailers who brought the products into Massachusetts."  (*Id.* ¶ 19).  According to Russell, "Kleen Concepts does not spend and has never spent any money on marketing targeted at Massachusetts residents."  (*Id.* ¶ 20).

### B.   Procedural Background

On December 23, 2014, Hilsinger filed the complaint in this case against FBW.  Hilsinger filed an amended complaint on January 23, 2015.  On February 6, 2015, FBW filed a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2) and improper venue under Fed. R. Civ. P. 12(b)(3), or, in the alternative, to transfer the case to the Southern District of Texas under 28 U.S.C. § 1404(a).  In its motion to dismiss, FBW contends that it has never made or sold any product that uses the SHIELDME mark.

On March 6, 2015, Hilsinger filed a motion to amend the complaint to "add additional grounds to cancel [FBW's] federal trademark registrations, to add a count for declaratory

judgment as to forfeiture of trademark rights, and to add Kleen Concepts . . . as a party defendant." On April 2, 2015, the Court granted the motion to amend. The second amended complaint alleges (1) federal trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) federal unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (3) unfair competition in violation of common-law trademark rights. Hilsinger seeks (1) cancellation of the two SHIELDME trademark registrations (Reg. No. 4,027,820 and Reg. No. 4,497,007); (2) a declaratory judgment that FBW has failed to control Kleen Concepts' use of the accused mark and has thus lost any rights it may have had in them and that Kleen Concepts has no rights in the accused marks; (3) damages; (4) injunctive relief; and (5) attorneys' fees and costs.

On April 14, 2015, Kleen Concepts filed a motion to dismiss for lack of personal jurisdiction. On May 12, 2015, the Court held an evidentiary hearing on the two motions to dismiss.

## II.     **Burden of Proof**

The plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). A district court faced with a motion to dismiss under Rule 12(b)(2) may choose among several methods for determining whether the plaintiff has met its burden: the "*prima facie*" standard, the "preponderance-of-the-evidence" standard, or the "likelihood" standard. *Daynard*, 290 F.3d at 50-51, 51 n.5; *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675-78 (1st Cir. 1992).

When a district court considers a motion to dismiss for lack of personal jurisdiction

without first holding an evidentiary hearing, the *prima facie* standard governs its determination. *United States v. Swiss Am. Bank*, 274 F.3d 610, 618 (1st Cir. 2001). In conducting a *prima facie* analysis, the court is required to take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed), construing them in the light most favorable to the plaintiff; the court, however, should not credit "conclusory allegations or draw farfetched inferences." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994). The court can "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Daynard*, 290 F.3d at 51. Although the court will construe the facts in the light most favorable to the plaintiff in a motion to dismiss, the plaintiff still has the burden of demonstrating each jurisdictional requirement. *See Swiss American*, 274 F.3d at 618. Pursuant to Fed. R. Civ. P. 12, a defense of lack of jurisdiction "whether made in a pleading or by motion, . . . must be heard and decided before trial unless the court orders deferral until trial." Fed. R. Civ. P. 12(i). "If a district court applies the *prima facie* standard and allows a motion to dismiss, it complies with the directive that the motion 'shall be heard and determined before trial. . . . .'" *Boit*, 967 F.2d at 676. However, if it "applies the *prima facie* standard and denies the motion to dismiss, it is implicitly, if not explicitly, ordering 'that hearing and determination [of the motion to dismiss] be deferred until the trial.'" *Id.* (alterations in original). Although the *prima facie* standard is a "useful means of screening out cases in which personal jurisdiction is obviously lacking, and those in which the jurisdictional challenge is patently bogus[,] . . . the approach offers little assistance in closer, harder-to-call cases, particularly those that feature conflicting versions of the facts." *Foster-Miller*, 46 F.3d at 145.

In cases that feature conflicting versions of the facts, courts may therefore choose to

employ the "preponderance-of-the-evidence" standard or the "likelihood" standard to consider the question of personal jurisdiction. This is especially true when a court determines that "in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam* jurisdiction." *Boit*, 967 F.2d at 676. When applying the "preponderance-of-the-evidence" standard, courts may hear and determine the motion to dismiss before trial. *Id.* The "preponderance-of-the-evidence" standard "necessitates a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial." *Foster-Miller*, 46 F.3d at 146. The court may consider "all relevant evidence proffered by the parties and mak[e] all factual findings essential to disposition of the motion." *Boit*, 967 F.2d at 676. "After the parties have proffered their evidence, the court may weigh evidence and make findings about whether plaintiff has made a showing as to each jurisdictional fact. In doing so, it may apply a preponderance-of-the-evidence standard." *Id.* Although the preponderance of the evidence standard allows the court to resolve the issue of personal jurisdiction definitively, "troubling issues may later be presented, in the same or another forum, as to whether doctrines of either 'issue preclusion' or 'law of the case' preclude a party from asserting at trial . . . contentions of fact contrary to what the district court found at the pretrial hearing." *Id.* at 677. Such issues may be especially concerning "when factual issues are common to both the jurisdictional question and the claim on the merits." *Id.*

Therefore, if the court determines that (1) resolving a motion "on the *prima facie* standard (thereby deferring the final jurisdictional determination until trial) imposes on a

defendant a significant expense and burden of trial on the merits in the foreign forum that is unfair in the circumstances," and (2) resolving a motion on the "preponderance-of-the-evidence" standard presents potential issues regarding issue preclusion and law of the case, it may employ a third option: the intermediary "likelihood" standard. *Id.* Under that standard, "even though allowing an evidentiary hearing and weighing evidence to make findings, the court may merely find whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Id.* The "likelihood" standard "constitutes an assurance that the circumstances justify imposing on a foreign defendant the burdens of trial in a strange forum, but leaves to the time of trial a binding resolution of the factual disputes common to both the jurisdictional issue and the merits of the claim." *Foster-Miller*, 46 F.3d at 146. In evaluating a motion to dismiss on a "likelihood" standard, the court may "place reasonable constraints on the scope and length of the evidentiary hearing." *Boit*, 967 F.2d at 678. Although the court may "tak[e] into account evidence offered by the defendant[s] as well as that offered by the plaintiff[], and consider[] the scope of the opportunity of each party to proffer evidence," it "may dismiss after proceeding only far enough to find that plaintiffs have not shown a likelihood of the existence of each fact essential to jurisdiction." *Id.* Judges employing the "likelihood" standard "should proceed with great care." *Foster-Miller*, 46 F.3d at 148. Prior to using the "likelihood" standard, it is important "to ensure that parties are given satisfactory notice, reasonable access to discovery, and a meaningful opportunity to present evidence." *Id.* at 148-49.

Here, there is an apparent factual dispute as to whether FBW actually manufactures or sells products with the SHIELDME mark. Hilsinger has submitted a letter from attorney Maria Speth in which she purports to represent FBW. In that letter, she stated that her "client has used

the SHIELDME trademark in connection with the products described above for over four years."
(Scott Decl. Ex. 3, Docket No. 12-1). In response, FBW has submitted affidavits from
Weinstein, Russell, and Speth in which they stated that Speth in fact represented Kleen
Concepts, that FBW has never used the SHIELDME trademark, Kleen Concepts is the only
entity that has used the SHIELDME mark, and that FBW has no control over Kleen Concepts.
(Speth Decl; Weinstein Decl, Docket No. 9-1; Russell Decl., Docket No. 9-2). In light of that
apparent dispute, the Court set the matter for an evidentiary hearing. Any factual issues as to
whether FBW manufactures or sells products with the SHIELDME mark that may require
resolution to determine the jurisdictional question may also overlap with the merits of this case.
Accordingly, the Court will apply the "likelihood" standard to resolve defendants' motions to
dismiss for lack of personal jurisdiction.[1]

## III.    Findings of Fact

The Court finds that there is a likelihood that the following jurisdictional facts exist.[2]

1.      FBW has never manufactured, sold, distributed, or marketed any products identified by
the SHIELDME mark.

---

[1] Based on the First Circuit's instruction in *Foster-Miller*, 46 F.3d at 148, the Court held a conference on June 2, 2015, during which it advised the parties that it would apply the likelihood standard. The Court asked the parties whether further discovery would be helpful or whether the evidentiary hearing needed to be reopened prior to the Court making its ruling. On June 4, 2015, Hilsinger notified the Court that it "neither requires jurisdictional discovery nor requests that the evidentiary hearing be reopened." (Hilsinger's Notice Regarding Jurisdictional Discovery & Evidentiary Hearing, Docket No. 53). On June 5, 2015, Kleen Concepts notified the Court that "it does not request that the hearing be reopened and does not believe that additional jurisdictional discovery is required." (Kleen Concepts' Notice, Docket No. 54).

[2] The facts are derived from the following materials: (1) Second Am. Compl., Docket No. 27; (2) Weinstein Decl., Docket No. 9-1; (3) Russell Decl., Docket No. 9-2; (4) Scott Decl., Docket No. 12-1; (5) Speth Decl., Docket No. 17-2; (6) Russell Decl., Docket No. 21-1; (7) Scott Decl., Docket No. 26-1; (8) Nahmias Decl., Docket No. 33-1; (9) Suh Decl., Docket No. 33-2; (10) Russell Decl., Docket No. 46; (11) Stack Decl., Docket No. 47; (12) Pl.'s Exs. 1-19 for May 12, 2015 Hr'g; (13) Russell Test. at May 12, 2015 Hr'g; (14) Weinstein Test. at May 12, 2015 Hr'g; (15) Nahmias Test. at May 12, 2015 Hr'g.

2. Kleen Concepts is the only entity that has used the SHIELDME mark and sold products under that name.

3. FBW has no control over Kleen Concepts' operations. Specifically, FBW has no control over the manufacturing, sale, or distribution of any SHIELDME products.

4. Although FBW was the registered owner of two SHIELDME trademarks (one through assignment and one by original application to the USPTO) at the time this litigation began, FBW had (apparently informally) licensed the use of these trademarks to Kleen Concepts. At the time this litigation commenced, Kleen Concepts had an exclusive license to use the SHIELDME marks.

5. Kleen Concepts is based in Arizona and has no operations, offices, assets, or employees in Massachusetts. It does not ship products directly into Massachusetts.

6. Kleen Concepts sells SHIELDME products to Walmart. These products appear in the Walmart vision department of three Walmart brick-and-mortar stores in Massachusetts. Walmart collects these products from Kleen Concepts in Arizona, ships them to distribution centers, and sends them to retail locations.

7. Kleen Concepts sells SHIELDME products to Sears. These products appear in a total of three Sears and Kmart stores in Massachusetts. Kleen Concepts ships these products to Sears distribution centers in Pennsylvania, Illinois, Texas, and California, and Sears distributes them to retail locations from there.

8. SHIELDME products are also available at a Micro Center store in Cambridge, Massachusetts. Micro Center has only one location in Massachusetts. Kleen Concepts sends its products to Micro Center in Ohio, and Micro Center distributes them to retail

locations from there.  Kleen Concepts has sold approximately $3,000 worth of SHIELDME products through Microcenter in Massachusetts every year since 2010, when Micro Center opened its store in Cambridge.

9.     SHIELDME products are available online on Amazon marketplace.  Kleen Concepts does not ship directly to customers who buy on Amazon.  It ships SHIELDME products to Amazon's distribution centers in Kentucky, Pennsylvania, Arizona, and Indiana.

10.    Kleen Concepts sells its products to approximately three or four third-party distributors. Among the distributors is Petra Industries Wholesale Distributor.  Kleen Concepts sends SHIELDME products to the third-party distributors, who then populate online retailers with these products.  Best Buy and Staples are two of the online retailers who sell these products online.

11.    In 2014, Kleen Concepts had total Massachusetts sales of SHIELDME lens-cleaning products of $11,090 and $14,900 for all SHIELDME products.  Those sales represent the totals sold through retailers with brick-and-mortar stores in Massachusetts.  They do not include sales into Massachusetts through online marketplaces.  Those products ranged in price from $0.99 to $19.99.  In 2014, the total revenue of all sales from SHIELDME products was approximately $3 million.

12.    Kleen Concepts has never advised any of the retailers or distributors that sell its products to not sell or distribute them in Massachusetts.

13.    Kleen Concepts desires a nationwide presence, and it does not want to carve out an important market such as Massachusetts.

14.    Kleen Concepts runs two websites: www.shieldmeproducts.com and www.kleenconcepts.com.  These websites are available to people in Massachusetts.

15.    The website www.shieldmeproducts.com contains information about SHIELDME

products.  It allows users to tweet product information, "like" products on Facebook, e-

mail product information to friends, comment directly on the website, and post comments

about the product on the product Facebook page.  In addition, a "contact" page provides

website visitors with contact information for "ShieldMe Products" and allows visitors to

send a message to Kleen Concepts.  Although consumers cannot buy products directly on

the website, they could contact Kleen Concepts to determine where they can buy

SHIELDME products.

16.    Kleen Concepts became aware of the allegation that SHIELDME products were

infringing Hilsinger's SHIELD trademark in July 2014, when it received a cease-and-

desist letter from Hilsinger.

17.    On February 12, 2015, after the litigation against FBW had commenced, FBW assigned

both SHIELDME trademark registrations to Kleen Concepts.

## IV.    <u>Standard of Review</u>

The exercise of personal jurisdiction over a defendant must be authorized by statute and

consistent with the due process requirements of the United States Constitution.  *Nowak v. Tak*

*How Invs., Ltd.*, 94 F.3d 708, 712 (1st Cir. 1996); *Intech, Inc. v. Triple "C" Marine Salvage,*

*Inc.*, 444 Mass. 122, 125 (2005); *Good Hope Indus., Inc. v. Ryder Scott, Co.*, 378 Mass. 1, 5-6

(1979).  Furthermore,

[a] district court may exercise authority over a defendant by virtue of either general
or specific jurisdiction.  Specific jurisdiction exists when there is a demonstrable
nexus between a plaintiff's claims and a defendant's forum-based activities.  General
jurisdiction exists when the litigation is not directly founded on the defendant's
forum-based contacts, but the defendant has nevertheless engaged in continuous and
systematic activity, unrelated to the suit, in the forum state.

*Swiss Am. Bank*, 274 F.3d at 618 (citations omitted) (internal quotation marks omitted).

To establish personal jurisdiction, plaintiff must show that the requirements of the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, are satisfied, and that the exercise of jurisdiction is consistent with constitutional due process. *Daynard*, 290 F.3d at 52; *Boit*, 967 F.2d at 675; *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005). The Supreme Judicial Court has interpreted the long-arm statute as extending as broadly as to the limits of constitutional due process. *Daynard*, 290 F.3d at 52; *"Automatic" Sprinkler Corp. of America v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972). Therefore, the relevant inquiry is the constitutional one.

Due process requires that a defendant over whom a Massachusetts court will exercise jurisdiction has maintained "minimum contacts" with the state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). It is well-established that the Due Process Clause imposes three requirements on the exercise of jurisdiction over out-of-state defendants. *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005).

> First, the defendant must have sufficient 'minimum contacts' with the [Commonwealth]. For specific jurisdiction, the plaintiff's claim must be related to the defendant's contacts. For general jurisdiction, in which the cause of action may be unrelated to the defendant's contacts, the defendant must have continuous and systematic contacts with the state. Second, for either type of jurisdiction, the defendant's contacts with the state must be purposeful. And third, the exercise of jurisdiction must be reasonable under the circumstances.

*Id.* at 57.

## V.  <u>Analysis</u>

Defendants contend that this case should be dismissed for lack of personal jurisdiction. As to FBW, plaintiff contends that the Court has specific jurisdiction because (1) it was the

registered owner of the SHIELDME trademarks, (2) it used the SHIELDME marks, and (3) SHIELDME products were sold at brick-and-mortar stores in Massachusetts. As to Kleen Concepts, plaintiff contends that the Court has both general jurisdiction and specific personal jurisdiction. It contends that the Court has general jurisdiction because Kleen's contacts with Massachusetts are continuous and systematic based on the sale of its products in brick-and-mortar retail stores in Massachusetts. It contends that the Court has specific jurisdiction over Kleen Concepts because (1) Kleen Concepts maintains an interactive website, accessible in Massachusetts, (2) its products are available for purchase in brick-and-mortar and online retail stores in Massachusetts, and (3) Hilsinger has suffered financial harm in Massachusetts.

### A.  Kleen Concepts Specific Jurisdiction

#### 1.  Relatedness

To satisfy the relatedness requirement, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *Daynard*, 290 F.3d at 60 (quoting *Foster-Miller*, 46 F.3d at 144). Hilsinger has affirmatively alleged that defendant infringed on its trademark by selling its products in Massachusetts and by operating an infringing website, causing it harm in Massachusetts. Therefore, the first jurisdictional prong is met as to Kleen Concepts.

#### 2.  Purposeful Availment

A defendant's in-state contacts "must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Daynard*, 290 F.3d at 61 (quoting *Foster-Miller*, 46 F.3d at 144). "The cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and

foreseeability." *Id.* (quoting *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995)).

"Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions of the defendant *himself*.'" *Adams v. Adams*, 601 F.3d 1, 6 (1st Cir. 2010) (quoting *Phillips v. Prairie Eye Ctr*, 530 F.3d 22, 28 (1st Cir. 2008)) (emphasis in original). "The contacts must be deliberate, and 'not based on the unilateral actions of another party.'" *Id.* (quoting *Phillips*, 530 F.3d at 28).

There does not appear to be any dispute that SHIELDME products are sold in Massachusetts through both brick-and-mortar stores and online retailers. However, there do not appear to be any facts that support a finding that Kleen Concepts sells directly to Massachusetts consumers or ships directly to Massachusetts locations. Instead, Hilsinger's jurisdictional theory relies in part on the stream-of-commerce theory.

### a.    The Stream-of-Commerce Theory

The starting point for analysis of the stream-of-commerce theory is the Supreme Court's decision in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). In *World-Wide Volkswagen*, a husband and wife brought a products-liability action in Oklahoma after they sustained injuries in an accident in Oklahoma involving an automobile that they purchased in New York. *Id.* at 288. The defendants were the automobile's manufacturer, its importer, its regional distributor, and its retail dealer. *Id.* The retailer and regional distributor moved to dismiss for lack of personal jurisdiction. *Id.* at 288-89. The Court found that where the retailer and regional distributor limited their sales to the New York area and conducted no activity whatsoever in Oklahoma, "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* at 298 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Therefore, the mere fact that

17

the automobile sold in New York was driven by the plaintiffs to Oklahoma did not support a finding of minimum contacts to support personal jurisdiction. *Id.* at 298-99.

The First Circuit first examined a stream-of-commerce fact pattern in *Dalmau Rodriguez v. Hughes Aircraft Company*, 781 F.2d 9 (1st Cir. 1986). In *Dalmau Rodriguez*, a tort action was brought against a helicopter manufacturer after the helicopter crashed, leaving two of its occupants seriously injured. *Id.* at 10. The First Circuit rejected the "stream-of-commerce" theory for purposeful availment. *Id.* at 15. The court found that the manufacturer's only contacts "were the submission of [a] bid, a trip by a[n] . . . employee for technical help and advice, and a visit by a . . . sales representative to Puerto Rico in 1977 or 1978." *Id.* at 14-15. Under those circumstances, the court held that "[a]ssuming that [the manufacturer] knew that the destination of the helicopters was Puerto Rico, [the court did] not think that the sale of two helicopters to a police department can be the source of a stream of commerce." *Id.* at 15.

The Supreme Court next ruled on the stream-of-commerce theory in *Asahi Metal Indus. Co. v. Superior Ct. of Calif., Solano Cnty.*, 480 U.S. 102 (1987). In *Asahi*, a plaintiff brought a product liability action in California after a motorcycle accident. *Id.* at 106. One of the defendants was Cheng Shin, the manufacturer of the motorcycle tire tube. *Id.* Cheng Shin filed cross complaints seeking indemnification from its codefendants and Asahi, the Japanese manufacturer of the tube's valve assembly. *Id.* Asahi manufactured its tire valve assemblies in Japan, sold them and shipped them to Cheng Shin in Taiwan, and Cheng Shin incorporated them into its tire tubes, some of which ended up in California. *Id.* Although the entire court determined that the facts of the case did not support the exercise of personal jurisdiction, there was no majority decision. The plurality decision of four justices by Justice O'Connor held that the

"substantial connection," between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*. The placement of a product into the stream of commerce, without more, is not an act of the defendant directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

Assuming, *arguendo*, that respondents have established Asahi's awareness that some of the valves sold to Cheng Shin would be incorporated into tire tubes sold in California, respondents have not demonstrated any action by Asahi to purposefully avail itself of the California market. Asahi does not do business in California. It has no office, agents, employees, or property in California. It does not advertise or otherwise solicit business in California. It did not create, control, or employ the distribution system that brought its valves to California. There is no evidence that Asahi designed its product in anticipation of sales in California. On the basis of these facts, the exertion of personal jurisdiction over Asahi by the Superior Court of California exceeds the limits of due process.

*Id.* at 112-13 (citations omitted) (emphasis in original).

In *Boit v. Gar-Tech Products, Inc.*, 967 F.2d 671 (1st Cir. 1992), the First Circuit adopted Justice O'Connor's *Asahi* plurality opinion as consistent with its "stream of commerce" jurisprudence. *Id.* at 682-83. In *Boit*, the Boit family sued Gar-Tech, a manufacturer, after a contractor used an electric hot-air gun allegedly manufactured by Gar-Tech to strip paint from the family's house in Maine. *Id.* at 673. The plaintiffs alleged that the contractor had ordered the gun through a Brookstone catalog he received at his home in Maine. *Id.* at 674. They alleged that Gar-Tech had sold the gun to Brookstone, a retailer, who then shipped the gun to the contractor in Maine. *Id.* The First Circuit determined "Gar-Tech had never conducted or transacted any business in Maine, had never owned or operated any wholesale or retail sales outlets in Maine, had never advertised in Maine, had never employed any persons in Maine, and

had never owned any real estate or other property in Maine." *Id.* at 673-74. The court further

determined that the "record [did] not support the Boits' allegation that Gar-Tec sold the hot air

gun to Brookstone." *Id.* at 681. Therefore, the court found that the plaintiffs had not made a

*prima facie* showing of personal jurisdiction. *Id.* However, the First Circuit concluded that

"[e]ven if the Boits had proffered evidence that . . . would support findings that Gar-Tec sold the

hot air gun to Brookstone and that Gar-Tec knew or should have known that the hot air gun

could be sold by Brookstone to a customer in Maine, . . . the record would have remained

insufficient to satisfy the requirement of a *prima facie* showing of personal jurisdiction over Gar-

Tec." *Id.* at 681. As a result, "because 'mere awareness' that a product may end up in the forum

state does not constitute 'purposeful availment,'" the First Circuit held that "the district court

could not have constitutionally exercised personal jurisdiction over Gar-Tec." *Id.* at 683.

In *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81 (1st Cir. 1997), the First Circuit

examined a similar issue. In *Rodriguez*, a Puerto Rican resident brought a products liability

action against Fullerton, a California tire manufacturer and dealer. *Id.* 82-85. Fullerton then

sued CMSC, the tire rim manufacturer who sold Fullerton tire rims "knowing that Fullerton

would incorporate them into tires and offer them for sale in distant markets." *Id.* at 84. The First

Circuit ruled that "[e]ven assuming that CMSC had specific knowledge that the stream of

commerce would move its tire rims into Puerto Rico . . . this awareness alone would not be

enough to constitute the purposeful availment which is necessary for a showing of minimum

contacts." *Id.* at 85.

In 2011, the Supreme Court again ruled on a stream-of-commerce case in *J. McIntyre*

*Machinery, LTD v. Nicastro*, 131 S. Ct. 2780 (2011). In *J. McInytre*, a worker who seriously

injured his hand while using a metal-shearing machine brought a products-liability action in New

Jersey against the manufacturer of the machine. *Id.* at 2786. Although the Court held that the exercise of personal jurisdiction was unconstitutional, it again did not form a majority opinion. The plurality opinion by Justice Kennedy determined that the plaintiff's claim of jurisdiction centered "on three facts: The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey." *Id.* at 2790. The plurality explained that the general rule is that "the exercise of judicial power is not lawful unless the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* at 2785. The plurality noted that there "may be exceptions, say, for instance, in cases involving an intentional tort. But the general rule is applicable in this products-liability case, and the so-called 'stream-of-commerce' doctrine cannot displace it." *Id.* The plurality explained that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* at 2788. The plurality held that although the "facts may reveal an intent to serve the U.S. market," New Jersey was without jurisdiction because the defendant did not engage in any activities in New Jersey that revealed an intent to benefit from the protections of its laws. *Id.* at 2790-91.

Justice Breyer wrote a concurring opinion in *J. McIntyre* in which he expressed concern about what he characterized as "the plurality's seemingly strict no-jurisdiction rule." *Id.* at 2793. Specifically, he wrote that the

> plurality seems to state strict rules that limit jurisdiction where a defendant does not "inten[d] to submit to the power of a sovereign" and cannot "be said to have targeted the forum." But what do those standards mean when a company targets the world

by selling products from its Web site?  And does it matter if, instead of shipping the products directly, a company consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills the orders?  And what if the company markets its products through popup advertisements that it knows will be viewed in a forum?  Those issues have serious commercial consequences but are totally absent in this case.

*Id.* (citations omitted).  He stated that he would "not work such a change to the law in the way either the plurality or the New Jersey Supreme Court suggests without a better understanding of the relevant contemporary commercial circumstances."  *Id.* at 2794.  Therefore, because "resolving th[e] case require[d] no more than adhering to [the Court's] precedents," he concurred with the plurality "only in the judgment of [the] opinion and not its reasoning."  *Id.* at 2792-94.

### b.    <u>Application of Case Law</u>

It is clear from the foregoing line of cases that the fact that a defendant places its product into the stream of interstate commerce, knowing that it may end up in Massachusetts, is not enough to establish "purposeful availment"; there must be something more.  In this case, there are at least three additional factors that favor the exercise of personal jurisdiction over Kleen Concepts:  (1) this action is for trademark infringement; (2) Kleen Concepts is a manufacturer that sells finished products to national retailers such as Walmart and Amazon.com with at least hundreds of those products being sold to consumers in Massachusetts in 2014 alone; and (3) Kleen Concepts operates a website that may be viewed anywhere in the United States and contains at least some interactive features.

First, this action is for trademark infringement.  The Supreme Court and First Circuit stream-of-commerce cases discussed above all appear to involve products liability claims.  In *J. McIntyre*, the plurality indicated that there may be exceptions to the rules of purposeful availment, "for instance, in cases involving an intentional tort."  131 S. Ct. at 2785.  In *Calder v.*

*Jones*, 465 U.S. 783 (1984), a professional entertainer filed a suit for libel in California against

the author of an article and the editor. *Id.* at 784. Although the article was written and edited in

Florida, the Supreme Court determined that "California [was] the focal point both of the story

and of the harm suffered." *Id.* at 789. As a result, the Court found that because the "intentional,

and allegedly tortious, actions were expressly aimed at California," jurisdiction was "proper in

California based on the 'effects' of [the] Florida conduct in California." *Id.* Other courts in this

jurisdiction have found that trademark infringement is akin to an intentional tort.[3] *See Edvisors*

*Network, Inc. v. Educational Advisors, Inc.*, 755 F. Supp. 2d 272, 284 (D. Mass. 2010) ("Courts

in this jurisdiction have determined that trademark infringement, like libel, involves conduct that

is purposefully directed at the state in which the trademark owner is located." (citing *Venture*

*Tape Corp. v. McGills Glass Warehouse*, 292 F. Supp. 2d 230, 233 (D. Mass. 2003); *Digital*

*Equip Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 470 (D. Mass. 1997)); *Bose Corp. v.*

*Neher*, 2010 WL 3814886 (D. Mass. July 30, 2010) (finding that because "trademark

infringement injury occurs in the state where the trademark owner resides," purposeful availment

prong is met when plaintiff alleges defendant committed trademark infringement against a

Massachusetts company); *see also Bird v. Parsons*, 289 F.3d 865, 876 (6th Cir. 2002) (finding

that Ohio long-arm statute authorizes personal jurisdiction over defendants where "defendants'

acts . . . allegedly 'caused tortious injury in Ohio,' because violations of federal trademark law

---

[3] In *Sun Life Assur. Co. of Canada v. Sun Bancorp, Inc.*, 946 F. Supp. 2d 182 (D. Mass. 2012), this Court found that the analogy between trademark infringement cases and other intentional tort cases was misguided. This Court's decision in *Sun Life* is readily distinguishable. In *Sun Life*, the Court held that jurisdiction could not be asserted under the Massachusetts long-arm statute. *Id.* at 189-90. In dicta, the Court found that where the sole contact at issue was that of a website and there were no alleged sales or other infringing contacts in the trademark holder's home state, the due process requirements for personal jurisdiction were not met. *Id.* at 191. This Court's reasoning depended in large part on the fact that the sole trademark infringement in the forum state was through a passive website. Also, the Court found it relevant that the plaintiff had not alleged intentional trademark infringement. *Id.* Here, the relevant trademark infringement involves sales in plaintiff's home state. As a result, this case is much more akin to the *Calder* case.

are analogous to tort cases"); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (applying *Calder* effects test to trademark infringement action because "the present case is akin to a tort case"); *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1389-91 (8th Cir. 1991) ("Like *Calder*, this case involves intentional tortious wrongdoing—namely, the use of the trademark with knowledge of the infringement."). These courts have explained that where "a case involves an intentional tort such as trademark infringement, 'the defendant's purpose may be said to be targeting of the forum state and its residents.'" *Edvisors Network*, 755 F. Supp. 2d at 283 (quoting *Venture Tape*, 292 F. Supp. 2d at 233 (quoting *Digital Equip*, 960 F. Supp. at 469)).

Here, Hilsinger is a Massachusetts company. Its trademark registration of the SHIELD mark provided Kleen Concepts with constructive notice of its home state. Also, Hilsinger sent Kleen Concepts a cease-and-desist letter to which counsel for Kleen Concepts responded. After the suit was filed, Kleen Concepts accepted assignment of the trademark registrations for the accused SHIELDME marks. Under these circumstances, Kleen Concepts could "anticipate being haled into court in Massachusetts [because] . . . the target of the alleged trademark infringement [is] a Massachusetts company." *Edvisors Network*, 755 F. Supp. 2d at 283.

Second, Kleen Concepts is a manufacturer that sells finished products to national retailers such as Walmart, Sears, and Amazon.com. An unknown number—likely thousands—of products were sold by those retailers to consumers in Massachusetts in 2014 alone. The Supreme Court and First Circuit stream-of-commerce cases have involved either a manufacturer selling parts that are incorporated by another manufacturer before eventually being sold in the forum state, *see Asahi Metal Indus.*, 480 U.S. 102; *Rodriguez*, 115 F.3d 81, or have involved isolated sales to the forum state, *see J. McIntyre*, 131 S. Ct. 2780; *Boit*, 967 F.2d 671; *Dalmau*

*Rodriguez*, 781 F.2d 9. In Justice Breyer's concurrence in *J. McIntyre*, he expressed concern

with joining the plurality opinion "without a better understanding of the relevant contemporary

commercial services." 131 S. Ct. at 2794. Breyer specifically pondered how a stream-of-

commerce theory would be affected "if, instead of shipping [its] products directly, a company

consigns the products through an intermediary (say, Amazon.com) who then receives and fulfills

the orders?"

Here, Kleen Concepts has acknowledged an intent to develop a national market for its

SHIELDME brand. It has sold to national retailers. Other courts have found that sales to

national retailers reveal a specific intent to target those states in which the national retailers do

business. *See, e.g.*, *Frito-Lay North America, Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859

(E.D. Tex. 2012) (finding that personal jurisdiction is proper in patent infringement action where

manufacturer fulfils purchase orders for Walmart); *Furminator, Inc. v. Wahba*, 2011 WL

3847390 (E.D. Mo. Aug. 29, 2011) (finding personal jurisdiction over defendant in Eastern

District of Missouri because plaintiff made *prima facie* showing that defendants "knew that the

products in question that they sold on eBay.com or Amazon.com were available to Missouri

residents, were in fact sold to at least one Missouri resident (Plaintiff), and more importantly

were counterfeit, infringing on a Missouri company's trademark"); *Icon Health & Fitness, Inc. v.

Horizon Fitness, Inc.*, 2009 WL 1025467 (E.D. Tex. Apr. 16, 2009) (finding that Eastern District

of Texas has jurisdiction over defendant manufacturer in patent infringement case because as "a

result of contracting to manufacture products for sale in Sears and other national retail stores,

[manufacturer] could have expected that it could be brought into court in the states where Sears

and other stores are located"); *JKA, Inc. v. Anisa International, Inc.*, 2008 WL 4949126 (D.R.I.

Nov. 13, 2008) (finding that Rhode Island district court could exercise personal jurisdiction over

defendant because it "placed its product into an established distribution channel by selling to Kmart, and it knew at the time of the sale of the product to Kmart that Rhode Island would be a terminal point for the distribution of the product"); *Kernius v. International Electronics*, 433 F. Supp. 2d 621 (D. Md. 2006) (finding personal jurisdiction over defendant proper where defendant sells devices "in thousands of quality and trusted stores and catalogs across the USA and other countries, including: RadioShack, Best Buy, Target, [and] Wal-Mart"); *Fallon Luminous Prods. Corp. v. Multi Media Elecs., Inc.*, 343 F. Supp. 2d 502, 507 (D.S.C. 2004) ("[Manufacturer] has purposefully directed its activities at South Carolina because it sold the allegedly infringing neon signs to Wal-Mart, which distributes products through an established nationwide distribution channel."); *Estes v. Midwest Products, Inc.*, 24 F. Supp. 2d 621 (S.D. W. Va. 1998) (holding that manufacturer was subject to personal jurisdiction in Southern District of West Virginia in products liability action because it "manufactures *finished* products which it directs to the 'national market' directly through its sales to national retailers Kmart, Wal-Mart, and others").[4]

---

[4] Many of these cases are patent infringement actions. *See Frito-Lays*, 867 F. Supp. 2d 859; *Icon Health & Fitness*, 2009 WL 1025467; *JKA*, 2008 WL 4949126; *Kernius*, 433 F. Supp. 2d 621; *Fallon Luminous Prods.*, 343 F. Supp. 2d 502. District courts apply Federal Circuit personal jurisdiction law to patent infringement actions. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994). In stream-of-commerce cases, the Federal Circuit has declined to decide whether it follows Justice O'Connor's plurality in *Asahi* or Justice Brennan's opinion, because it has "yet to be presented with facts that do not meet the more rigorous standard adopted by Justice O'Connor." *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1322 n.7 (Fed. Cir. 2005) (citing *Beverly Hills Fan*, 21 F.3d at 1566; *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 428 (Fed. Cir. 1996)). As a result, the patent infringement cases that have applied Federal Circuit law to find personal jurisdiction is proper presumably have determined that the relevant contacts meet "the more rigorous standard adopted by Justice O'Connor."

In *Estes*, 24 F. Supp. 2d 621, the Southern District of West Virginia applied Fourth Circuit law. *Id.* at 629-30. The "Fourth Circuit has adopted a standard that is aligned with Justice O'Connor's more stringent approach to the stream of commerce." *Kernius*, 433 F. Supp. 2d at 625 n.2 (citing *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994) ("To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism.")).

Likewise, the "intent and purpose" of Kleen Concepts are "completely revealed in its decision to sell through national retail chains."  *See Estes*, 24 F. Supp. 2d at 630; *see also Kernius*, 433 F. Supp. 2d at 627 ("A corporation cannot sell its products to national retailers such as RadioShack, Best Buy, Target, and Wal-Mart and then claim that it is surprised to be haled into court in a particular State because, to the best of the corporation's knowledge, it was not specifically aware that its products were actually sold or used in that State.").  For example, Kleen Concepts "intentionally sells the allegedly infringing [products] to Wal-Mart knowing that it has stores throughout the nation." *Fallon Luminous Prods.*, 343 F. Supp. 2d at 507 ("By selling the neon signs to Wal-Mart, a likely destination of the neon signs is one of the eighteen Wal-Mart discount stores or forty-two Wal-Mart supercenters in South Carolina.").  It has not instructed Walmart or any other national retailer not to sell in Massachusetts, and it acknowledges that it wants a nationwide presence.  Therefore, Kleen Concepts intends for its product to be sold wherever Walmart and Sears have stores and wherever Amazon.com sells to consumers—including Massachusetts.

Third, Kleen Concepts operates the SHIELDME website.  As Kleen Concepts contends, "'the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum.'" *Cossaboon v. Maine Medical Center*, 600 F.3d 25, 35 (1st Cir. 2010) (quoting *McBee v. Delica Co.*, 417 F.3d 107, 124 (1st Cir. 2005)).  "[F]or website activity to support the exercise of personal jurisdiction, '[s]omething more is necessary, such as interactive features which allow the successful online ordering of the defendant's products.'" *Id.* (quoting *McBee*, 417 F.3d at 124).  Other courts in this district have looked to *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), to determine whether a website can give rise to specific

jurisdiction. *See, e.g.*, *Edvisors Network*, 755 F. Supp. 2d at 282; *Sportschannel New England Ltd. Partnership v. Fancaster, Inc.*, 2010 WL 3895177, *5 (D. Mass. Oct. 1, 2010).*[5]* In *Zippo*, "the court determined, after reviewing the available case law and other materials that 'the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.'" *Edvisors Network*, 755 F. Supp. 2d at 282 (quoting *Zippo Manuf. Co.*, 952 F. Supp. at 1124). The court in *Zippo* described a sliding scale where

> [a]t one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involves the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Manuf. Co.*, 952 F. Supp. at 1124 (citations omitted). Although Kleen Concepts does not sell products on the SHIELDME website and does not appear to specifically target Massachusetts residents in general, the website is not entirely passive. The website contains information about SHIELDME products. It allows users to tweet product information, "like" products on Facebook, e-mail product information to friends, comment directly on the website, and post comments about the product on the product Facebook page. In addition, a "contact" page provides website visitors with contact information for "ShieldMe Products" and allows

---

[5] To determine whether website activity supports the exercise of *general* jurisdiction, the First Circuit focuses "on the extent to which the defendant has actually and purposefully conducted commercial or other transactions with forum state residents through its website." *Cossaboon*, 600 F.3d at 35.

visitors to send a message. Visitors to the website can contact Kleen Concepts to determine where they can buy SHIELDME products. Were the jurisdictional claims based entirely on the website, it seems unlikely that this Court could exercise personal jurisdiction over Kleen Concepts. However, in light of the sales into Massachusetts through national retailers, the subject matter of this litigation, and the website activity, the "purposeful availment" prong for personal jurisdiction is met.

### 3. **Reasonableness**

Even if the requisite contacts exist, the court's exercise of jurisdiction must "comport[] with traditional notions of 'fair play and substantial justice.'" *Nowak*, 94 F.3d at 717 (citing *International Shoe*, 326 U.S. at 320). The Supreme Court has identified five "gestalt factors" which bear upon the fairness of subjecting nonresidents to this Court's jurisdiction. *Id.* These factors are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *Id.* (citing *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

First, Kleen Concepts contends that it would be burdensome for it to defend itself in Massachusetts, as it has no operations outside of Arizona. However, it is "almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." *Id.* at 718. For this particular factor to have any significance, "the defendant must demonstrate that 'exercise of jurisdiction in the present circumstance is onerous in a special, unusual, or other constitutionally significant way.'" *Id.* (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)). Kleen Concepts has not made that demonstration here.

Second, a "state generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp.*, 471 U.S. at 473. Massachusetts has an interest in adjudicating a trademark violation involving a Massachusetts business because "the alleged infringement is likely to have its most significant effects here." *Edvisors Network*, 755 F. Supp. 2d at 285 (quoting *Northern Light Tech., Inc. v. Northern Lights Club*, 97 F. Supp. 2d 96, 107 (D. Mass. 2000)). Specifically, "Massachusetts has an interest in preventing trademark infringement against those subject to the protections and requirements of its laws." *Id.* Therefore, this factor weighs in plaintiff's favor.

Third, plaintiff's choice of forum must be accorded a degree of deference. *Nowak*, 94 F.3d at 718. This is obviously the most convenient forum for plaintiff, as it is Hilsinger's principal place of business.

Fourth, Kleen Concepts contends that the interest of the judicial system in obtaining the most effective resolution of the controversy favors Kleen Concepts. It contends that "with such a small amount of its product brought into Massachusetts by third parties, monitoring any violation and enforcing any judgment against [it] would be best accomplished in Arizona." (Kleen Concepts Mot. Dismiss 16). However, the harm to Hilsinger is in Massachusetts, where it has its principal place of business. "The most efficient path for the judicial system . . . is to move forward with the lawsuit in the present forum." *Edvisors*, 755 F. Supp. 2d at 285 (quoting *Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 45 (D. Mass. 1997)).

Fifth, both parties agree that the common interests of all sovereigns in promoting substantive social policies are not affected.

Therefore, on balance, the "gestalt" factors are either neutral or favor the plaintiff. Accordingly, the exercise of jurisdiction in Massachusetts will not offend traditional notions of

fair play and substantial justice.

In summary, the Court finds that the constitutional requirements for personal jurisdiction over Kleen Concepts have been satisfied. Accordingly, Kleen Concepts' motion to dismiss will be denied.[6]

### B.     FBW Specific Jurisdiction

The issue of personal jurisdiction over FBW is relatively straightforward. FBW has never manufactured, sold, distributed, or marketed any products identified by the SHIELDME mark. Its only relationship with the SHIELDME brand is that it was at one time the registered owner of the two SHIELDME marks. However, Kleen Concepts is the only entity that has used the SHIELDME mark and sold products under that name. FBW has no control over the operations of Kleen Concepts. It therefore has no control over the manufacturing, sale, or distribution of any SHIELDME products.

"The mere existence of a licensor-licensee relationship, without more, is 'insufficient to impute the contacts of a licensee on the licensor for the purpose of establishing personal jurisdiction.'" *Eco Pro Painting, LLC v. Sherwin-Williams Co.*, 807 F. Supp. 2d 732, 736-37 (N.D. Ill. 2011) (quoting *Sinclair v. StudioCanal, S.A.*, 709 F. Supp. 2d 496, 510 n.8 (E.D. La. 2010). "As a general rule, personal jurisdiction does not exist over a licensor by virtue of its status if it does not exercise control over the licensee's sales activities and has no dealings with the licensee 'beyond the receipt of royalty income.'" *Id.* at 737 (quoting *Eragen Biosciences, Inc. v. Nucleic Acids Licensing, LLC*, 447 F. Supp. 2d 930, 938 (W.D. Wisc. 2006). Here, FBW did not even receive royalty income based on the licensing of the SHIELDME mark. FBW had no

_____

[6] Because the Court finds that personal jurisdiction is appropriate based on specific jurisdiction, the Court need not evaluate plaintiff's general jurisdiction arguments.

control over the use of the marks by Kleen Concepts. It appears that FBW was merely used as a holding company of sorts. There appears to be no other relationship between the parties.

Under the circumstances, the relationship between FBW and Kleen Concepts is not enough to establish personal jurisdiction over FBW. Accordingly, FBW's motion to dismiss will be granted.

**VI.**   <u>**Conclusion**</u>

For the foregoing reasons,

1.     The motion to dismiss by Kleen Concepts, LLC for lack of personal jurisdiction is DENIED, and

2.     The motion to dismiss by FBW Investments, LLC for lack of personal jurisdiction is GRANTED.

**So Ordered.**


                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
Dated: June 17, 2015                                United States District Judge