## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **THE HILSINGER COMPANY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No.**<br>) **14-14714-FDS** |
| | ) |
| **KLEEN CONCEPTS, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTIONS
### FOR PARTIAL SUMMARY, PLAINTIFF'S MOTION TO STRIKE,
### AND CROSS-MOTIONS TO EXCLUDE EXPERT TESTIMONY

**SAYLOR, J.**

This is an action for trademark infringement. Plaintiff Hilsinger Company has brought

suit against defendant Kleen Concepts, LLC, alleging that Kleen's use of the mark

"SHIELDME" in connection with the distribution and sale of cleaning products has infringed

Hilsinger's "SHIELD" brand. The complaint alleges claims under the Lanham Act, 15 U.S.C.

§§ 1114 and 1125, and for violation of common-law trademark rights.

There are five motions pending before the Court: (1) defendant's motion for partial

summary judgment on certain infringement claims, (2) defendant's motion for partial summary

judgment on the claim for false designation of origin, (3) plaintiff's motion to strike defendant's

reply to plaintiff's response to defendant's motion for summary judgment on certain

infringement claims, (4) plaintiff's motion to strike the expert opinion of Brian M. Sowers, and

(5) defendant's motion to strike the expert opinion of Dr. Melissa Pittaoulis.

For the following reasons, plaintiff's motion to strike will be granted; plaintiff's motion

to exclude the expert opinion of Brian M. Sowers will be granted in part and denied in part; and the other motions will be denied.

## I.    Factual Background

Unless otherwise noted, the following facts are undisputed.

The Hilsinger Company is a corporation based in Plainville, Massachusetts, that sells eyewear and eye-care accessories. (Def. Mot. Partial Summ. J. on Pl. False Designation of Origin Claim SMF ¶ 1, "Def. False Designation SMF"). Hilsinger holds a federal trademark registration for the mark "SHIELD" (Reg. No. 1,536,028) in connection with "[o]ptical lens cleaning preparation products." (*Id.* ¶ 2; Third Amended Compl. ¶¶ 12–13 "TAC").

Kleen Concepts, LLC, is a limited liability company based in Scottsdale, Arizona, that sells lens- and screen-cleaning products, among other things. (*Id.* ¶ 4).

### A.    SHIELDME Branded Products

Around 2008, Kleen Concepts began selling products using the mark "SHIELDME." (Russel Dep. 20). It has sold both lens- and screen-cleaning products under that mark. (Def. False Designation SMF ¶ 6; Russell Dep. 119).

At least some SHIELD and SHIELDME products were sold at Wal-Mart, among other retail stores. (Pl. Resp. to Def. Mot. for Partial Summ. J. on Infringement Claims SMF ¶¶ 5, 11, "Pl. Infringement SMF"). Many of the other facts concerning where SHIELDME products were sold, and to whom they were sold, are disputed. Kleen Concepts contends that its screen-cleaning products were sold in electronics stores, and the electronics departments of "big box stores" such as Wal-Mart. (Def. Infringement SMF ¶ 11; Russell Dep. 120–21). Hilsinger disputes that contention, pointing to deposition testimony by a Kleen Concepts salesperson who stated that the company had "never sold anything" to the electronics division at Wal-Mart.

(Walsh Dep. 186–87). Kleen Concepts contends that SHIELDME lens-cleaning products were not sold side-by-side with SHIELD lens-cleaning products; while Hilsinger asserts the opposite. (Fitzgibbon Dep. 14; Def. Resp. to Pl. Mot. to Exclude Ex. 10). The parties further dispute whether the target consumer for SHIELDME products was "very general," ranging from anyone who needed to clean anything from "a screen to a lens to a table," or whether a more narrow consumer group was targeted by virtue of the packaging. (Def. Rep. to Pl. Infringement SMF ¶ 9).

Kleen Concepts sells the same liquid cleaning product as both a lens cleaner and a screen cleaner. (*Id.* ¶ 1). The products differ only in that they are marketed for different purposes. (*Id.*). Kleen Concepts has advertised lens-cleaning products as capable of cleaning not only "eyeglasses, sunglasses, . . . binoculars, scopes and other lense[s]," but also "electronic devices . . . and screen materials." (Pl. Infringement SMF Ex. 12). In addition, some of Kleen Concepts's products are advertised as dual "lens and screen cleaner[s]." (Def. Infringement SMF Ex. 11 at 4). Kleen Concepts contends that very few of its products are sold as dual lens and screen cleaners and that sales of dual-use products account for an insignificant portion of its screen-cleaning product sales. (Def. Rep. to Pl. Resp. to Def. Infringement Mot. for Summ. J. at 5).

### B.      KLEENME Branded Products

In 2015, in response to this litigation, Kleen Concepts introduced the brand "KLEENME." (Pl. Resp. to Def. False Designation SMF ¶ 6, "Pl. False Designation SMF"). Kleen Concepts has moved for summary judgment as to the claims for products using the KLEENME mark. (Docket No. 236). Hilsinger responded to that motion by stating, correctly, that there is no claim in this case for damages concerning the use of the KLEENME mark.

### C.    "Made In America" Designation

Kleen Concepts has advertised and marketed certain screen- and lens-cleaning spray-bottle products as "Made in USA." (Def. False Designation SMF ¶ 7). Kleen Concepts also marketed some of its products using a red, white, and blue color scheme and depicting images of an American flag. (Pl. False Designation SMF Ex. L). Hilsinger contends that "significant components" of the products of Kleen Concepts that are designated as "Made in USA" were actually manufactured abroad. (TAC ¶ 44).[1]

In 2013, Wal-Mart announced an initiative to increase its sales of products manufactured in the United States. (Pl. False Designation SMF Ex. HHH). In February 2013, a Kleen Concepts representative sent an e-mail to an associate buyer for the optical department at Wal-Mart that stated, "I wanted to introduce our company to you, we are a large USA manufacturer of cleaning products. . . . We also offer the flexibility of a USA based supply chain!" (*Id.* Ex. III). In March 2014, that buyer sent an e-mail to another Wal-Mart employee concerning the SHIELDME lens cleaners, stating that they are "made in the USA 100%." (Pl. False Designation SMF Ex. RRR at Kleen 00004755). The following month, the buyer sent an e-mail concerning SHIELDME products, stating, "[a]s you know Made in the USA is a huge initiative with Wal-Mart. This item [referring to SHIELDME lens cleaning wipes] . . . is designed, manufactured and produced all in Arizona." (*Id.* Ex. PPP). She sent a third e-mail to the same effect in September. (*Id.* Ex. QQQ).

Between 2013 and 2016, the sales of Hilsinger to Wal-Mart diminished significantly, while the sales of Kleen Concepts to the retailer grew. (Janell Dep. 53–54; Phillips Report at 16). Hilsinger's Chief Financial Officer believes that the company's loss in sales can be

---

[1] Although the parties apparently dispute whether the products of Kleen Concepts were, in fact, made in the United States, that is not the basis for this motion and was not briefed or argued.

attributed to Kleen Concepts's "Made in America" claim, because the two companies' products were otherwise similar. (Janell Dep. 53–54). At his deposition, the CFO testified that although "there's clearly been lost sales" due to Kleen Concepts "Made in America" claim, he did not know "the magnitude of the impact." (*Id.* 137–38);

### D.    Expert Testimony

Both parties have retained experts to testify as to the likelihood of consumer confusion of SHIELD and SHIELDME branded products. Hilsinger retained Dr. Melissa Pittaoulis to design and conduct a likelihood-of-confusion survey. (Def. Mot. to Exclude Ex. 1 ¶ 9, "Pittaoulis Report"). Kleen Concepts retained Brian M. Sowers to design and conduct its own likelihood-of-confusion survey. (Def. Opp. to Pl. Mot. to Exclude Ex. 1 ¶ 8, "Sowers Report")

#### 1.    Pittaoulis Report

Melissa Pittaoulis is a consultant with an economic consulting firm. (Pittaoulis Report ¶ 1). She holds a doctorate in sociology and has authored a number of publications, including on Lanham Act surveys. (*Id.* ¶ 6).

In connection with this action, Pittaoulis conducted an online survey using what is known as the "*Squirt*" methodology. *See SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980). The purpose of the survey was to "determine whether consumers believe that Kleen Concepts['] . . . SHIELDME lens cleaners are made by the same company or otherwise affiliated with the company that makes SHIELD lens cleaners." (Sowers Report ¶ 9).

Pittaoulis selected the "array" variant of the *Squirt* survey method, in which multiple products bearing different marks, including the senior and junior marks, are displayed to respondents simultaneously in an array. According to Pittaoulis, such a survey was appropriate under the circumstances "because the products are sold in close proximity in the marketplace

and . . . 'SHIELD' is not likely to be a top-of-mind brand for consumers." (*Id.* ¶ 9).

Pittaoulis selected respondents based on a number of criteria, including whether they intended to purchased lens cleaner or screen cleaner in the next 12 months, and whether they would shop for that product at Wal-Mart. (*Id.* ¶ 15). In the survey, respondents were shown a side-by-side array of four bottles of lens cleaners bearing different marks, include the SHIELD and SHIELDME marks. (*Id.* ¶ 18). Respondents were asked whether they believed that the products were made by the same or different companies, and whether those companies were affiliated or associated with each other. (*Id.* ¶¶ 20–21).

Based on the survey results, Pittaoulis found that there was a net confusion rate of 28.7% among respondents. (*Id.* ¶ 34). She concluded that rate of confusion "demonstrates that when the SHIELDME trademark is used on optical products, it is likely to be confused with SHIELD optical products." (*Id.*).

### 2. Sowers Report

Brian Sowers is a consultant with a market research and consulting firm. (Sowers Report ¶ 1). He has a master's degree in business administration, and has "designed and conducted hundreds of market research surveys." (*Id.* ¶ 2).

Sowers also conducted an online survey using the *Squirt* method to test the likelihood of consumer confusion of SHIELD and SHIELDME products. However, rather than using the "array" format, Sowers selected the "line-up" format, in which images of products are shown sequentially, rather than simultaneously. According to at least one expert in the field, the line-up format of the *Squirt* survey is "far more frequently used" than the array format. (Jerre B. Swann, *Everready and Squirt–Cognitively Updated*, 106 L. J. of the Int'l Trademark Ass'n 727, 739 (2016), Docket No. 212-5).

Like Pittaoulis, Sowers selected respondents based on their stated intent to purchase lens-cleaning products from Wal-Mart. (Sowers Report ¶¶ 20, 23). Respondents were shown products displaying the SHIELD mark alone, and were then asked three "distractor questions" related to their shopping habits. (*Id.* ¶¶ 20, 23, 34). According to Sowers, the distractor questions were designed to "create some 'mental distance' between the Shield lens cleaner image and the lens cleaner images from the other companies" and to "help simulate the actual marketplace conditions of purchasing these lens cleaners, in which consumers encounter the two marks in close, but not literally side-by-side, proximity." (*Id.* ¶ 34). After being asked the distractor questions, respondents were shown three lens-cleaning products bearing different brands one at a time, in random order, including a SHIELDME product. (*Id.* ¶ 36). Sowers imposed a five-second delay between the display of each image of a lens-cleaning product. (*Id.*). After viewing all of the products seriatim, respondents were asked if they believed that any products were put out by the same company and whether they believed that the companies were connected or otherwise affiliated. (*Id.* ¶ 23). Based on that survey, Sowers concluded that there was a net confusion rate of 9% among consumers. (*Id.* ¶ 52).

At the end of the survey, Sowers asked respondents a final, open-ended question concerning their primary consideration when selecting a lens-cleaning product for purchase. (*Id.* ¶ 42). Specifically, they were asked, "[w]hat is your main consideration when choosing which lens cleaner to purchase?" and were given the opportunity to type a response. (*Id.* ¶ 42). Based on the responses to that question, he concluded that 88.4% of respondents did not mention brand as a primary consideration when deciding which lens cleaner to purchase, and that price was the "overwhelming factor" that consumers consider. (*Id.* ¶ 52).

At his deposition, Sowers testified that he had never authored an expert report as to a

primary-consideration survey. (Sowers Dep. 95). When asked whether he was "aware of the standard practices within [his] industry for designing such a report," he replied, "I've never done one, so no." (*Id.*) When asked whether he was "aware of any expert reports commissioned at [his marketing research firm] where an opinion was expressed as to primary consideration based on one question within a likelihood of confusion survey," he responded that he could not recall any. (*Id.* at 95–96).

## II.     Procedural Background

The third amended complaint filed by Hilsinger alleges seven counts arising under federal law and common law: (1) federal trademark infringement in violation of 15 U.S.C. § 1114; (2) federal unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a); (3) unfair competition under the common law; (4) cancellation of the trademark registration for a SHIELDME mark; (5) cancellation of a different trademark registration for a SHIELDME mark; (6) declaratory judgment; and (7) false advertising and false designation of origin in commercial advertising or promotion in violation of 15 U.S.C. § 1125(a).

Defendant has moved for summary judgment on two of those claims, and to exclude the expert testimony of Pittaoulis. Plaintiff has moved to strike one of defendant's filings in connection with those motions, and to exclude the expert testimony of Sowers.

## III.     Defendant's Motions for Summary Judgment and Plaintiff's Motion to Strike

Defendant has brought two motions for partial summary judgment. First, it seeks summary judgment as to the claims for trademark infringement brought under 15 U.S.C. § 1114 in connection with the sale of screen-cleaning products and products using the KLEENME mark. Second, it seeks summary judgment as to the claims for federal unfair competition and false designation of origin brought under 15 U.S.C. § 1125(a).

Plaintiff has moved to strike defendant's reply to plaintiff's response to defendant's motion for partial summary judgment as to the infringement claims.

## A.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256–57.

## B.    Infringement Claims

Defendant has moved for partial summary judgment on certain trademark infringement claims—specifically, those concerning defendant's sale of screen-cleaning products and the use of the KLEENME mark—on the basis that consumers are not likely to confuse the parties' marks.

"The key element in any infringement action is likelihood of confusion." *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1009 (D. Mass. 1988).  To determine whether there is a likelihood of consumer confusion of two competing marks, courts consider, among other things:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201, 1205 (1st Cir. 1983); *see also Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 487 (1st Cir. 1981).

"Likelihood of confusion is a question of fact," and therefore summary judgment should issue on that basis only if no reasonable fact-finder could find in the non-movant's favor. *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 64 (1st Cir. 2013).  "Because the likelihood of confusion analysis is a particularly fact-intensive one, resolving this issue on summary judgment is disfavored." *See id.* at 66.

### 1.    Screen-Cleaning Product Claims

Defendant first contends that summary judgment is warranted on claims in connection with the sale of *screen*-cleaning products bearing the SHIELDME mark, because those products are not sufficiently similar to plaintiff's *lens*-cleaning products bearing the SHIELD mark to be likely to cause confusion among consumers.

### a.    Similarity of the Products

Trademark protection may extend beyond the exact product to include related products or services.  *See, e.g., Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987) (finding that car sales and car repairs were related products); *Best Flavors, Inc. v. Mystic*

*River Brewing Co.*, 886 F. Supp. 908, 914 (D. Me. 1995) (finding that "all chilled nonalcoholic beverages, other than perhaps milk, are closely related for many beverage purchasing decisions"); *Perfection Fence Corp. v. Fiber Composites, LLC,* 2005 WL 353017, at *3 (D. Mass. Feb. 10, 2005) (finding that fencing and decking products were related). An owner of a trademark is afforded "protection against use of its mark on any product or service which would reasonably be thought by the buying public to have come from the same source." *Anheuser–Busch, Inc. v. Caught–on–Bleu, Inc.,* 288 F. Supp. 2d 105, 118 (D.N.H. 2003) (quoting 4 McCarthy on Trademarks and Unfair Competition § 24:6).

Under that standard, the lens-cleaning and screen-cleaning products at issue are unquestionably similar. Both are liquids designed and sold to clean dirt and smudges (such as fingerprints) from glass or other hard surfaces. In fact, some of defendant's own lens- and screen-cleaning products are identical. Defendant conceded that the screen-cleaning product sold under the SHIELDME brand contained liquid identical to that sold as a lens-cleaning product. The only difference between the two products was how they were advertised. The identity between the content of defendant's screen- and lens-cleaning products is strong evidence that the products are similar.

In addition, at least one of defendant's screen-cleaning products was advertised as a dual "lens and screen cleaner," and some of its lens-cleaning products were advertised as capable of also cleaning screens and electronic materials. Under the circumstances, a reasonable factfinder could find that defendant's screen-cleaning products are similar to plaintiff's lens-cleaning products.

**b.      Similarity of the Marks**

When determining the similarity of two marks, the court must consider the "sight, sound

and meaning" of the marks holistically. *Boustany v. Boston Dental Grp., Inc.*, 42 F. Supp. 2d 100, 108 (D. Mass. 1999).

Here, there is evidence that the effect of the SHIELD and SHIELDME marks is similar. The strongest indicator of their similarity is the identical use of the most salient word in each mark: "shield." *Dorpan,* 728 F.3d at 66 (1st Cir. 2013). In addition, although the two marks use different colors and graphics in logos, both use capital letters and *sans serif* fonts. (Docket No. 263 at 9). On balance, a reasonable factfinder could find that the "total effect" of the SHIELD and SHIELDME marks is substantially similar. *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 13 (1st Cir. 2012) (quoting *Volkswagenwerk,* 814 F.2d at 817).

   **c.**  **Relationship between the Parties' Channel of Trade, Juxtaposition of Advertising, and Classes of Prospective Purchasers**

The relationship between the parties' channels of trade, their advertising, and the classes of their prospective purchasers are normally considered together. *See Pignons,* 657 F.2d at 488; *see also Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass. 1995).

The parties agree that defendant's screen-cleaning products and plaintiff's lens-cleaning products were both sold at Wal-Mart. They dispute a number of other issues, including, among other things, whether defendant's screen-cleaning products were sold exclusively in electronics stores and the electronics department of big-box stores; whether the prospective purchasers for defendant's screen-cleaning products were the same as the prospective purchasers for its lens-cleaning products; and whether the differences in advertising targeted distinct groups of lens-cleaning product purchasers and screen-cleaning product purchasers. Those disputes, which appear to be material, cannot be resolved on summary judgment.

### d.    Conclusion

In short, plaintiff's evidence of similarity between the marks and the products, in combination with disputes of material fact concerning other factors, precludes the issuance of summary judgment in defendant's favor.  Therefore, defendant's motion for summary judgment as to the infringement claims concerning screen-cleaning products will be denied.

### 2.    KLEENME Product Claims

Defendant has moved for summary judgment concerning the likelihood of confusion between its KLEENME mark and plaintiff's SHIELDME mark.

Plaintiff contends that there is no claim in this case concerning infringement of the SHIELD mark by KLEENME-branded products.[2]  Indeed, the complaint does not allege that the KLEENME brand infringes on the SHIELD mark.  Instead, Count One of the complaint is directed entirely to the SHIELDME mark, alleging that SHIELDME infringes on plaintiff's rights in the SHIELD brand.  (TAC ¶¶ 24, 51).  As there is no claim concerning whether KLEENME infringes on the SHIELD mark, summary judgment is inappropriate as to that issue. *See* Fed. R. Civ. P. 56(c) ("A party may move for summary judgment identifying each claim or defense—or the part of a claim or defense—on which summary judgment is sought.").

Accordingly, defendant's motion for summary judgment concerning the KLEENME claims will be denied.

### 3.    Plaintiff's Motion to Strike Defendant's Reply

Plaintiff has moved to strike a portion of defendant's reply to its response in opposition to the motion for summary judgment on the KLEENME claims.  In its reply, defendant argued, for

---

[2] Plaintiff also opposes the motion on the basis that Kleen Concepts violated Local Rule 7.1(a)(2), which requires that parties meet and confer before a party files a motion.  Plaintiff requests fees and costs as a sanction for defendant's violation of that rule.  However, while the meet-and-confer process appears to have been somewhat perfunctory, at best, it does not appear that a sanction is warranted under the circumstances.

the first time, that summary judgment was warranted as to products that were co-branded with

KLEENME and SHIELDME marks.  In conjunction with that filing, defendant submitted the

declaration of its president, who attested as follows:

> Under the KLEENME brand, some of the rebranded SHIELDME lens cleansing
> wipes and screen cleansing wipes contain a SKU or product name that still
> indicates SHIELDME.  For these products, the external packaging bears the brand
> KLEENME while SHIELDME was reflected on the inside packaging.  This inside
> packaging cannot be seen by consumers until they open the exterior packaging
> after purchasing the product.

(Russell Decl. ¶ 7).  Defendant argued that it could not be liable for selling such "co-branded"

products because the accused mark is only visible after sale, and the post-sale-confusion doctrine

does not apply in this case.  Thereafter, plaintiff moved to strike defendant's reply, arguing that it

was improper for defendant to raise new facts and argument concerning the co-branded products

in its reply.

It is well-settled that "it is generally inappropriate for a moving party to advance new

arguments and supporting facts in a reply brief."  *United States v. Tsarnaev*, 2015 WL 45879, at

*2 (D. Mass. Jan. 2, 2015).  While other courts in this circuit have adopted local rules requiring

that parties are "strictly confined" to replying to issues raised in the opposition in reply briefs,

this court has not adopted an analogous local rule.  *See* D. Me. LR 7(c); *see also* D.N.H. LR

7.1(e)(1) (New Hampshire local rule providing substantially the same); D.P.R. L. Civ. R 7(c)

(Puerto Rico local rule providing substantially the same); D.R.I. LRcv 7(b)(2) (Rhode Island

local rule providing substantially the same).  Nonetheless, the reason for those rules is equally

apt here:  "[p]arties are required to raise all of their arguments in their opening brief to prevent

'sandbagging' of the nonmoving party and to provide opposing counsel the chance to respond."

*Roth v. Loos & Co.*, 2009 WL 2525484, at *3 (N.D. Cal. Aug. 17, 2009).

Here, defendant's reply brief presented an entirely new legal theory concerning the co-

branding of SHIELDME and KLEENME products, as well as an affidavit containing new facts that it argued were "undisputed." Furthermore, plaintiff contends that despite defendant's representations, those new facts are disputed. The question of whether the facts in defendant's newly-submitted declaration are disputed or not highlights the need for a prohibition against the submission of new facts and argument in a reply brief. Defendant should not have waited to introduce that argument and its supporting facts until filing a reply, leaving plaintiff without recourse to dispute it.

Accordingly, the Russell Declaration and the portion of the reply concerning the co-branding argument (Part II) will be struck.

### C.    False Designation of Origin Claim

Defendant has moved for summary judgment on plaintiff's claim for false designation of origin on two grounds:  (1) that plaintiff has not made the required showing of actual harm to its business to sustain the claim, and (2) that plaintiff has not submitted any evidence of actual consumer confusion.

The Lanham Act prohibits false and misleading descriptions of products and services in interstate commerce. *See* 15 U.S.C. § 1125(a). "The statute was designed to protect consumers and competitors from any duplicitous advertising or packaging which results in unfair competition." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310 (1st Cir. 2002) (citing 15 U.S.C. § 1125(a)). To prove a claim for false advertising under the Lanham Act, a plaintiff must show:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is

likely to be injured as a result of the misrepresentation, either by direct diversion
of sales or by a lessening of goodwill associated with its products.

*Id.* at 310–11.

### 1. <u>Actual Harm</u>

Defendant contends that plaintiff has not introduced any evidence of actual harm caused by the "Made in USA" designation, because plaintiff's expert calculated damages based solely on disgorgement of profit, rather than diversion of sales.

"In order to recover damages for a section 1125(a) violation, the aggrieved party must show that it suffered actual harm to its business." *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1977). Among other things, a showing of "a diversion of sales" constitutes actual harm for the purposes of § 1125(a). *Id.*

Although defendant contends that plaintiff's expert failed to provide evidence of actual harm due to the "Made in USA" designation, there is other evidence of actual harm in the record. For example, plaintiff's Chief Financial Officer testified that the company lost a significant amount in sales to Wal-Mart following the introduction of defendant's products bearing the "Made in USA" designation. That loss coincided with Wal-Mart's initiative to increase its sales of products manufactured domestically, as well as a dramatic increase in sales of defendant's products to Wal-Mart. In that context, the testimony attributing plaintiff's lost sales to defendant's "Made in USA" claims is sufficient to create a triable issue as to whether plaintiff suffered actual damages. *Cf. Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 6 (1st Cir. 1993) (finding that a deponent's one-word answer to a leading question, standing alone, was properly found to be insufficient to create a triable issue as to actual harm). Although the CFO could not specify the "magnitude" of the harm, a "precise showing" of damages "is not required." *Quabaug Rubber Co.*, 567 F.2d at 161.

Accordingly, disputed issues of material fact preclude the issuance of summary judgment on the basis that plaintiff has failed to show actual harm arising out of defendant's "Made in USA" designation.

## 2.    Actual Consumer Confusion

Defendant next contends that summary judgment is warranted on the claim for false designation of origin because there is no evidence of actual consumer confusion, which is required for an implied-falsity claim.  Again, to prove a claim for false advertising under the Lanham Act, a plaintiff must show that the false or misleading representation "actually deceives or has the tendency to deceive a substantial segment of its audience."  *Cashmere & Camel Hair*, 284 F.3d at 311.  The relevant audience for the purposes of such a claim includes not only the buying public, but also "the retail stores that purchased" the products at issue.  *Id.* at 312 n.11.

Assuming, without deciding, that plaintiff must show evidence of actual consumer confusion under the circumstances, it has submitted sufficient evidence to create a triable issue on that point.[3]  In introducing its products to Wal-Mart, an employee of defendant sent an e-mail to a buyer at the retailer indicating that defendant was a "large USA manufacturer of cleaning products."  Later, that buyer sent multiple e-mails, including to others at Wal-Mart, indicating that she believed that SHIELDME lens-cleaning wipes were designed and manufactured entirely in Arizona.  Wal-Mart, and in particular its optical-product buyers, were a key target audience for the sale of SHIELDME lens-cleaning products.  The e-mails demonstrate that at least one of those buyers believed defendant's lens-cleaning products were made entirely in the United

---

[3] In its prior order on defendant's motion to dismiss, the Court noted that most courts analyze "Made in the USA" claims under an implied-falsity theory, as opposed to literal-falsity theory, and observed that the complaint "appears to state a claim for false designation of origin under an implied-falsity theory."  Defendant contends that by that ruling, the Court conclusively determined that plaintiff was restricted to an implied-falsity theory.  In fact, the Court did not make such a ruling, and plaintiff is not precluded by that order from pursuing a claim of literal falsity.

States.[4]  Plaintiff has submitted sufficient evidence to create a triable issue as to whether

consumers were actually deceived.

### 3. Conclusion

Accordingly, the motion for partial summary judgment as to the claim for false

designation of origin will be denied.

## IV. Motions to Strike Expert Testimony

Both parties have moved to exclude the opinions of the opposing party's expert on

liability.  Under Fed. R. Evid. 702, courts considering the admissibility of scientific testimony

must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable

foundation and is relevant to the task at hand.'"  *Samaan v. St. Joseph Hosp.,* 670 F.3d 21, 31

(1st Cir. 2012) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

Pursuant to that gatekeeping function, a court may admit expert testimony only if three

conditions are satisfied:  (1) the proposed expert is qualified by knowledge, skill, experience,

training, or education; (2) the subject matter of the proposed testimony properly concerns

scientific, technical, or other specialized knowledge; and (3) "the testimony [will be] helpful to

the trier of fact, i.e., . . . it rests on a reliable foundation and is relevant to the facts of the case."

*Bogosian v. Mercedes-Benz of N. Am., Inc.,* 104 F.3d 472, 476 (1st Cir. 1996).  A court may

exclude an expert's opinion when it is "based on conjecture or speculation from an insufficient

evidentiary foundation."  *Damon v. Sun Co.* 87 F.3d 1467, 1474 (1st Cir. 1996) (quoting *Van*

*Brode Group, Inc. v. Bowditch & Dewey,* 36 Mass. App. Ct. 509, 520 (1994)).

---

[4] Defendant contends that the e-mails between Wal-Mart employees constitute inadmissible hearsay and therefore cannot be used in opposition to its motion.  However, under Fed. R. Evid. 801(c)(2), hearsay is defined to include only evidence of out-of-court statements offered to "prove the truth of the matter asserted."  Hilsinger does not offer the Wal-Mart communications to prove what was asserted—namely, that Kleen Concepts's products were made in the USA.  Instead, plaintiff contends that the communications are probative of Wal-Mart employees' beliefs concerning whether the products were made in the USA.

## A.     Format of the Surveys

Both parties have moved to exclude the opinions of their opponent's expert on the ground that the survey format each chose was unreliable under the circumstances.

The experts used survey methodologies that were substantially similar.  Both experts used the *Squirt* survey method in order to determine the likelihood of consumer confusion. According to one third-party expert, the *Squirt* survey is the method of choice for testing consumer confusion between weak marks.  *See Survey Formats—Two commonly used formats to test for confusion*, 6 McCarthy on Trademarks § 32:173.50 (4th ed.).

Using the *Squirt* method, both experts conducted an online survey in which respondents viewed products displaying the SHIELD and SHIELDME marks, and were asked questions concerning the relationship of the companies that use those marks.  (Pittaoulis Report ¶¶ 20–22). Both experts showed respondents the same four product brands.  Thereafter, both experts asked respondents substantially the same questions concerning their perception of the similarities between the products and the affiliation of the companies that produce the products.

As plaintiff states, "[t]he primary way in which the experts' surveys differed is that Dr. Pittaoulis designed and conducted an 'array' version of the *Squirt* format, while Sowers conducted a 'sequential line-up' version of the *Squirt* format."  (Pl. Mot. to Exclude at 5).  Each party has moved to exclude the expert testimony of the opposing party based on that difference. Each party contends that the other party's expert relied on incorrect assumptions concerning how the products at issue were sold, and therefore selected the wrong variant of the *Squirt* survey.

It appears that the array and line-up survey formats are best adapted to different market conditions.  The array format may be more appropriate where products are displayed side-by-side, and has been criticized by courts as failing to replicate market conditions where the

products at issue were "scattered among a host of other" products. *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1147 (10th Cir. 2013). By comparison, the line-up format may be more appropriate to replicate market conditions in which "consumers encounter the marks in close, but not literally side-by-side, proximity." (Sowers Report ¶ 34).

Plaintiff contends that the array format is appropriate here because SHIELD and SHIELDME products were displayed in close proximity in Wal-Mart stores. Defendant contends the opposite: that the line-up format is appropriate because the parties' products were *not* displayed in close proximity. Neither party has presented conclusive evidence that the SHIELD and SHIELDME lens-cleaning products were always, or even often, presented either in close proximity or in more distant locations. Rather, they have provided conflicting evidence concerning the display of the products on isolated occasions that can best be described as anecdotal. Each party need not conclusively prove that the factual underpinnings of its expert testimony is correct in order for testimony to be admissible. Rather, challenges to the factual underpinnings of an expert's opinion "is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *United States v. Vargas*, 471 F.3d 255, 264 (1st Cir. 2006) (quoting *Int'l Adhesive Coating, Co. v. Bolton Emerson Int'l,* 851 F.2d 540, 545 (1st Cir. 1988)). In light of the conflicting evidence presented, neither party's expert will be excluded from testifying on the basis that he or she relied on incorrect assumptions concerning the display of the products.

B.    **Plaintiff's Remaining Objections Concerning Sowers's Methods**

Plaintiff further objects to the opinion of Sowers because of his use of what it contends are unconventional methods, including the imposition of a five-second delay between the display of each product. However, the concerns that plaintiff cites go to the weight of the evidence,

rather than its admissibility, and are best left for exploration on cross-examination. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare and the present case is not among them.") (citation omitted). Furthermore, plaintiff has not demonstrated that the concerns it cites cause the probative value of Sowers's survey to be substantially outweighed by the danger of unfair prejudice. *Cf. Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000) (citing cases in which survey evidence was excluded under Fed. R. Evid. 403).

Accordingly, Sowers's report concerning the likelihood of consumer confusion will not be excluded on the basis that it relies on unconventional methods.

### C. Plaintiff's Objection to Sowers's Opinion Concerning Consumers' Primary Purchasing Consideration

Plaintiff next contends that the primary-purchasing-consideration portion of Sowers's survey is flawed because it does not rest on reliable methods.

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *See Daubert,* 509 U.S. at 595. That requirement ensures that "the reasoning or methodology underlying the testimony is scientifically valid and . . . that [the] reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The party offering the expert testimony has the burden of proving that the testimony is based on reliable methods. *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 (1st Cir. 2014).

At the end of the *Squirt* survey concerning likelihood of confusion, Sowers shifted gears and asked respondents an open-ended question concerning their primary purchasing consideration. Specifically, respondents were asked, "[w]hat is your main consideration when

choosing which lens cleaner to purchase?" From the written responses to that question, Sowers concluded that the "overwhelming majority of respondents (88.4%) did not mention brand as a primary consideration when deciding which lens cleaner to purchase. Price was the overwhelming factor that consumers consider when purchasing lens cleaner." Plaintiff contends that defendant's method of surveying respondents to determine their primary purchasing consideration is entirely untested and inconsistent with the academic consensus.

The field of consumer survey research is "not unqualified and without hazards." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010). Courts have observed that "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions. . . . The nature of the beast is that it is a sample, albeit a scientifically constructed one." *Id.* (quoting 6 McCarthy on Trademarks § 32:184). Despite the imperfect nature of the science behind survey design, the reliability of an expert's methods must be assessed, among other things, in comparison to "accepted standards of objective procedure and statistics in the field of such surveys." *Id.* (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 433 (S.D.N.Y. 2004)).

Defendant has not directed the court to *any* evidence demonstrating that Sowers's methods for determining primary purchasing consideration have been tested, subjected to peer review, are commonly accepted in the field, or have otherwise been scientifically validated. (Def. Opp. to Pl. Mot. to Exclude 17–19); *see also Daubert*, 509 U.S. at 593. While those factors do not constitute a rigid test for admissibility, they are relevant in determining whether an expert's methods are sufficiently reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). Indeed, when Sowers was asked at his deposition whether he was "aware of the standard practices within [his] industry for designing [a primary consideration survey report]," he

responded, "I've never done one, so no." (Sowers Dep. 95). He testified that he was also not aware of any expert opinion given on primary consideration "based on one question within a likelihood of confusion survey," as was done here. (*Id.* at 95–96). Nor has defendant made any attempt to demonstrate that Sowers's methods were reliable independently of industry practices. (Def. Opp. to Pl. Mot. to Exclude 17–19). Instead, it simply concluded, without any citation, support, or further argument, that Sowers "worked from a reliable survey methodology." (*Id.* at 18). That assertion, standing alone, is not sufficient to demonstrate the reliability of Sowers's methods.[5]

Instead of arguing that Sowers's methods were reliable, defendant contends that plaintiff has not pointed the Court to any relevant authority demonstrating that Sowers's methods are *un*reliable. However, it is defendant's burden to prove that its expert's testimony is admissible— not plaintiff's to prove the opposite. *Bricklayers*, 752 F.3d at 96. In the absence of any showing that those methods are scientifically valid, consistent with industry standards, or otherwise reliable, Sowers's opinion as to primary purchasing consideration is inadmissible under Fed. R. Evid. 702. *See Daubert*, 509 U.S. at 593; *Heer v. Costco Wholesale Corp.*, 589 F. App'x 854, 862 (10th Cir. 2014) ("Federal courts have consistently held that compliance with industry standards is relevant to a reliability determination under Rule 702.")

Accordingly, plaintiff's motion to exclude the expert testimony of Brian M. Sowers will be granted as to his opinion concerning primary purchasing consideration.

V. <u>Conclusion</u>

For the foregoing reasons,

1.      Defendant's motion for partial summary judgment on certain trademark

---

[5] To be clear, the Court is not ruling that the method used by Sowers was necessarily unreliable, but rather that defendant has not put forth sufficient evidence to establish its reliability.

infringement claims (Docket No. 236) is DENIED.

2.    Defendant's motion for partial summary judgment on the false designation of
       origin claim (Docket No. 224) is DENIED.

3.    Defendant's motion the exclude the expert opinion of Dr. Melissa Pittaoulis
       (Docket No. 212) is DENIED.

4.    Plaintiff's motion to exclude the expert opinion of Brian M. Sowers (Docket No.
       237) is GRANTED in part and DENIED in part.  Specifically, the motion is
       granted as to Sowers's opinion concerning consumers' primary purchasing
       consideration and is otherwise denied.

5.    Plaintiff's motion to strike defendant's reply to plaintiff's response to defendant's
       motion for summary judgment concerning products bearing the KLEENME mark
       (Docket No. 270) is GRANTED.

**So Ordered.**


                                                /s/  F. Dennis Saylor
                                                F. Dennis Saylor IV
 Dated:  September 1, 2017                       United States District Judge